Please all rise. Hear ye, hear ye. This Honorable Appellate Court for the 2nd Traditional District is now open. The Honorable George Bridges presiding. Take a seat. The Honorable George Casement Scott is sworn in. That's 21-0774, Chicago Trust Co. N.A. Petitioner from the New State Scholarship Foundation. Respondent Appellant and Kyriaki Blachos, et al. Respondents and Regents. Arguing for an appellate, Mr. Christopher N. Tyson. Arguing for an appellate, Mr. Randall B. Shane. Good morning. Are both sides ready to proceed this morning? Yes, Your Honor. You may begin. Justice Jorgensen, Justice Bridges, Justice Shastak, good morning. May it please the Court. My name is Christopher Heinskill, and I represent the Greek State Scholarship Foundation, which is referred to as IKY, which is an acronym of the Greek pronunciation of the name. Your Honors, this is a case concerning a testator who made a charitable gift to a foundation for purposes of establishing scholarships for Greek students. Well, let's start out with how is this a charitable gift if you are not recognized as a charity? Well, there is a difference between a 501c3 charity and the nature of the gift itself. And the expanse of the definition of a charitable gift is broader than the expanse of what, as an entity, constitutes a charity, particularly within the realm or within the context of the IRS Code 501c3. In fact, the trial court actually addressed this in the summary judgment hearing and specifically asked if we were contending that my client was a 501c3 charity. No, we are not. In fact, Chicago Trust Company amended its original petition not once but twice, but in the first instance not only to remove the entity that received the gift under 3.1, but to also remove a reference to us being a charity. But we're not arguing today that we are a charity. We're arguing today that the gift itself was for charitable purposes. And when we're determining the character of a charitable gift within the context of this particular case, particularly when this Court's role is to discern and to give effect to the intent of the testator, where it is a charitable gift, this Court has recognized again and again that it will go above and beyond to make sure that it upholds the nature of that charitable gift and to give it effect. Let me ask you, because having said all of that, your argument in your brief is, in the cases that you cite regarding charitable organizations, is to give this some kind of preference in determining whether or not this was a, assuming we agree on which version of the trust agreement, but it's to give that some, give the Court more deference in deciding whether or not this intent of the testator can be decided from these three documents. So you are arguing that it is a charitable organization, more than just it's not a 503C charity. Respectfully, that is not what we're arguing. And we are not arguing that somehow, because of the nature of the gift, we're supposed to give preference over all things being equal. And this comes up within the rules of construction. And I know that the family members had argued that there's also a recognition that as family members, rules of construction can favor them. What we are arguing is it tips the scales when you're talking about charity versus, particularly with what the testator intended, tipping the scales towards the family members. But again, and I do want to make clear, and if it's not clear in our brief, that's on me. I apologize. We are not arguing that we are a charitable entity. We take, we are to follow the instructions of the testator. We are to take the money. We're to hold it aside for purposes of scholarship. And the purposes of scholarship is what makes it, gives it the charitable character. It's to help someone. And again, there's a broad expanse of the definition of charity versus a charitable organization. It's a charitable, you're saying it's a charitable gift. It's a charitable gift, absolutely. And that's what we're doing. Which are favored in. Absolutely. And again, we're talking about tipping the scales here. But here is where we're at. The trial court erred, as a matter of law, in exalting what we'll call the blanks version. Everybody recognizes that the blanks version were the first two and the last page of an otherwise comprehensive trust agreement that was sent to UBS after the trust agreement shows that it was executed on July 11, 2005 and notarized on July 11, 2005. So let me just get this clear because this is really confusing. The blanks version, the first two pages and like the last two pages were given to UBS. Wasn't the entire blanks version given to them eventually? Not to you. We don't know. That's the problem. I'm glad you raised that, Madam Justice, because for the first time in the trial court's opinion, the trial court did two things. One, it said that the blanks version was the version that was attached to the third amended petition as Exhibit A. Chicago Trust Company's allegation is that that version attached as Exhibit A is a complete and comprehensive version of the trust agreement containing blanks. Okay? But then in its analysis and its description of the blanks version, the trial court says, well, the origin of this blanks version was what was sent to UBS in July of 2005. And it acknowledged that what was sent to UBS in 2005 was the first, second, and the last page. It wasn't a comprehensive agreement. So no one knows how we got from three pages being sent to UBS in 2005 to what was attached to the third amended petition, which is being represented as a complete version of the trust agreement. There's nothing there. But the court said that in their court ruling, didn't they? What it did is it characterized the blanks version as what was attached as Exhibit A. But again, and you're right, Madam Justice, the court acknowledged that what was given to UBS was just these three pages. And that was the point that we had raised. And it almost becomes an impossibility for the trustee to properly administer what is being characterized as the blanks version, being that July 2005, we call it an abstract. It's a partial version of the trust, because we don't know what happens after page 2, but before the execution of the notarization page. Everyone just assumes that this is the complete version, this being what is attached as Exhibit A to the third amended petition. But there's no evidence in the record to draw a link between 2005 blanks version and the blanks version that is attached as Exhibit A. There's no evidence. There's no facts or authentication. Let me ask you this. Shouldn't a signature page or a notarized page which was attached to the blanks version and which was sent to UBS constitute the descendant's execution of his initial trust, because that's why he sent it there? So even though we know that it was the three pages, doesn't that speak volumes about what his intent was in this matter? It does not, because the reason he was sending it to UBS was strictly to open a brokerage account. Doug Eaton, who was the financial representative at UBS, says you're required to send one of two things, either a complete version or an only partial version, which basically shows the nature of the trust, because you're opening the account in the name of the trust and evidence that it was executed and notarized. So that's what was sent to UBS. And that's important, because Doug Eaton, who was there on July 11, 2005, testified that Spiros Flachos walked in, wanted to get this thing notarized, but also acknowledged that he has no idea what was being notarized. He didn't review it. He didn't see anything. He didn't see any blanks being executed or filled in. He can't testify as to what Spiros Flachos had signed and notarized that day. And when the woman he notarized had died. And she's presumed to be deceased, Your Honor. So that's the point. Nobody can testify. And I think that's important, too, because in terms of summary judgment, I think everybody acknowledges that what we see in the factual record is what we're going to get at trial, which is why all of the parties acknowledge that summary judgment is appropriate. But how the Court erred is taking, and I can get to this very shortly, the presumption that what are called interlineations or the markings or the filling in of the blanks existed prior to the execution in July of 2005, while that presumption somehow was rebutted by the factual record. Counsel, isn't the only version of the trust agreement that was known to exist prior to Spiros' death was the blanks version? No. Okay. Why do you say that? Because it was an incomplete version. And that's why I wanted to give particular import to what was attached as Exhibit A, which we denied, by the way, was a complete and comprehensive version. What was attached as Exhibit A in the Third Amendment petition and what was sent to UBS. What was sent to UBS, and I can't overstate this because its importance can't be overstated, is that it was an incomplete version. We don't know. How do we make sense of the fact that Spiros provided UBS with the corrected version that he executed the trust agreement with, rather than he kept, I mean, in other words, this is the only document that we are aware of because it was sent to UBS. How do we make sense of this, that the other two that shows up after his death was somehow the superior documents? I'm glad you asked that question because here's the simple answer. We don't know. And that's the point. Nobody knows. The factual record can only give us what it shows. And what it shows is two things. Number one, that there was an incomplete version that happened to share the same execution and notarization page as what we'll call the figures version. We have two competing versions, and perhaps we should recast what we're actually talking about. What did he sign on July 11th? Was that just a bunch of notes? We don't know. We don't know. We have a copy. We have a copy. And we know that as it was given to him, it was signed and it was notarized. But it depends on what it is. Well, you suggested, we all agree, there's going to be no more facts. If this was a jury trial, it would still be the same article. Correct. Except we'd have a verdict to look at. But there's no additional evidence. So what is there out there that shows that the document that he signed on July 11th was not a full and completed trust document? It reflected his intent at that time, on July 11th. Well, everyone agreed up until UBS responded to the subpoena that what was signed and what was the governing document was the figures version. This never even became an issue until after this case was filed. And a subpoena went out to UBS, and UBS responded by producing what was in its file. What we have here are the same exact execution and notarization pages. But what was in its file was the blank version. What was produced was the blank, the July 2005 blanks version. That's what UBS produced, but that was provided to it for an altogether different purpose, which Mr. Eaton acknowledged, this was all that was required. And this is why the Martin v. Martin presumption is important. Because what we are talking about is a figures version. We've all characterized it as the figures version. But it's the trust agreement with handwritten notes in sections 3.1 and 3.2. Those are what are called interlineations, and those are different from alterations because interlineations are to be filled in which go to the essence of the actual instrument. We're talking about names of a legatee or the amounts of a gift. And in this case, that's exactly what was filled in. And there is a presumption that those 3.1 and 3.2 provisions contained those handwritten notes prior to the execution. It's a rebuttable presumption, but there is a presumption. And there is a this Court has recognized a distinction between a presumption and an inference. What the Court did was drew an inference based upon what it believed occurred, characterized that as summary judgment evidence, and says that evidence constitutes a rebuttal to the presumption in Martin v. Martin. Therefore, this Court is ruling that those interlineations did not exist prior to the execution of the agreement on July 2005. Now, how the Court concluded that was, A, this is the only version we know that was sent in to UBS prior to the testator's death, but that's irrelevant, because that would be one thing if the testator signed it. It would be one thing if the testator left a copy. Wait, wait. Go back up. Wait. It speaks nothing of when he signed what? We know when he signed it, don't we? Correct. I shouldn't be – and you're right, Your Honor. It says nothing of when those markings were included in Section 3.1 and 3.2. Right. It would be one thing if Mr. Vlachos walked into UBS's offices on July 11, 2005, signed it, had it notarized, and left that copy there. But he didn't. Mr. Reid testifies that he took it with him. So there's this gap in time of one month between the time he walked in and had it signed and the time that he sent the first, second, and last pages to UBS to open the brokerage account. That's why we can't exalt or give any credence to the trial court pointing out that this is the only version that has this, quote-unquote, chain of custody. Because the chain of custody was broken the minute that Mr. Vlachos walked out of UBS's offices because nobody can testify what happened after that. We don't know. The only thing – Doesn't – doesn't – isn't there a reasonable inference to make that when he – that that was his intent, that that's the document that he wanted to be there? I know you made some argument in your briefs, something about the fact that maybe he didn't want to tell the bank who he was leaving it to or – I don't understand that, that thinking, that he didn't want to come right out and say he was leaving the money to. But, I mean, does – is it unreasonable for the court to make that inference that this, in fact, is what his intent was? And your Honor, I hear that my time – I hear that my time is up, if I could answer your question. And that's where we were arguing the difference between a presumption and an inference. It's – is it unreasonable for the court to draw this inference? For purposes of the context in which we're deciding this summary judgment, yes. And I will submit that we need evidence. We need actual facts. Where are we going to get it? You're not. And that's why the presumption stays in Martin v. Martin. And that was the point. There is no evidence. There was just what the trial court believed could have happened. But that's not evidence. And the trial court even ruled in its opinion that based upon the summary judgment evidence, the presumption in Martin v. Martin is rebutted. But then it doesn't recite any actual evidence itself. It recites what it believes could have occurred. And for those reasons, Your Honors, we respectfully request that the trial court's order granting summary judgment in favor of the family members and against IKY be reversed and vacated. Thank you. Counsel, I have a question still. Yes. Because the family here, the defendant appellees, have argued that the only chain of custody for any document is the blank document. And as you know, this is a motion of summary judgment. And as the court pointed out, we have three documents here. And they're all different. You have the alternative figures document. You have the figures document. And so there could be no other evidence, as you pointed out and made clear, that would come up in this case. But with respect to the chain of custody, how do you answer, how do you respond to that, that the only document that would qualify as a chain of custody is the one sent to UBS? I would answer that two ways. Number one, the blanks version, what was sent to UBS again, is a mere abstract. It wasn't a complete version of the trust agreement. Number two, the chain of custody was broken the moment that Mr. Blatcher walked out of the office. There's a gap of one month. But didn't the blank, even the blank version, the three pages that were sent, carry or include 3.1 and 3.2? It did. But there's also a figures version with the same execution and same normalization. It was not sent to UBS. Sorry, Your Honor? It was not sent to UBS. It was not sent to UBS. But that speaks nothing of what, whether those blanks in 3.1 and 3.2 were filled in prior to Mr. Blatcher's executing the trust agreement. Because he didn't send it in doesn't say or doesn't point to or lead to any conclusion that 3.1 and 3.2 were not filled in. Any number of things could have happened. And Justice Shostak asked, isn't it reasonable to infer or assume or draw the conclusion? I could, for as many examples as you could give as to why he could have sent those blanks versions into UBS, I could come up with alternative reasons. But the point is, we are just basically taking a stab in the dark. We don't know. And that's the point. I have no further questions. Does either Justice have any additional questions? Nothing further. Thank you, Your Honor. Thank you, Counsel. At the conclusion of the Appellee's argument, you will have an opportunity for rebuttal. Thank you, Justice. Good morning, Your Honors. My name is Graham Schmidt. I am an attorney for the Appellees, which is Kiriaki Flacos, Ashley Ibushi, Lindsay Samirez, and Polyus, who in the briefs are described as the family members, and I might use that term here today. As Counsel noted, your job, the trial court's job, is to ascertain and to effectuate the settler's intent, but the intent when. And Illinois law makes it clear that the intent is when the trust instrument, assuming it's an instrument and not an oral trust, is actually created or validly amended. The IKY, as stated several times, says we do have meager evidence of what terms of the trust actually existed at the time that it was signed because it was signed not in the presence of an attorney, and then the one witness is not available to testify. So trial. Let me ask you this, because in reading the case here, isn't it a tremendous leap of faith for the trial court to infer that the blank version of the trust that was executed in 2005 was in fact his intent? It clearly covered and carried his intent for what he wanted to do with the trust. I don't think it's a leap of faith. The chain of events is actually fairly simple. What is it in this case that would say it is not?  His attorney, Spiros' attorney, created a document that was 98 percent complete, including pages 3, 4, 5, 6, 7. Sends it to the client. Apparently the client had still not come to a decision on the gift amounts in Section 3.1302. Said fill it in, sign it, give it to your financial advisor. Mr. Spiros-Lacoste then signs it, and a month later gives it to his financial advisor, and the document is still blank. It's not a leap of faith to say that he signed it when it was blank. That is the logical, reasonable inference from that chain of events. So he signed it in, was it 2005?  And then when did he die? 2016, Your Honor. So 2.1 of the trust allows him to amend it, correct? That's right. According to the actual procedures for what it's allowed for a valid amendment. Right. Which includes an instrument and a signature. And so the trial court also gave attention to the argument that perhaps even if he had not filled in these digits on July 11, 2005, that when he filled it in at some unknown time, at some unknown date, that those also were considered a valid amendment. And then the trial court ruled properly that a trust inherently cannot be amended. In fact, under Illinois law, the settler must reserve the right to amend his trust and then follow those procedures. And he did not follow those procedures. There's no separate signature. If I could amend it, but he had to follow certain procedures. That's right. And we know that he understood that because he actually amended it twice separately, by a separate instrument with a signature, and though not required, he also went out and got a notary. So Mr. Vlachos understood how to amend it, and then whenever those digits and words were written in, he did not amend it. And I can understand some sympathy for IKY saying, well, if that's his handwriting, can't we simply just ignore the fact that he didn't follow the procedures? The bar for amending a trust is so already low, and so the trial court sometimes has to effectuate trust amendments when all we have is a signature, no date. We don't have a notary. To take the bar even lower and saying, well, actually, you can simply just write in digits or words later on, and if you're both the settler and the trustee, and we don't know when those were written, and we don't know whether those were written with an idea to permanently add them or whether maybe it was in pencil and we were going to erase them later, that that also should be, goes to a place in public policy where we don't want to go, that the reason that we have ceremony and requirements for amending a trust is so that it can be reliable. This court, the trial court, is going to have to effectuate the settler's intent at specific moments in time. And erasing and then deleting and whiting out and writing in with no evidence of when those digits or writing goes too far essentially makes the trust into a holographic document where you can simply just write in the last thing you wrote that's discovered. And then in this case, you're going to have the mischief of having two separate instruments, discovery after death, with different words and different digits. You notice that IKY during its briefing and then also in their motion for summary judgment at the trial court, it essentially just ignores the alternative figures version because the alternative figures version undermines every single one of their arguments. They say under Martin v. Martin, we have to accept the document that has digits and words written into the blanks. But why not the alternative figures version? They don't want to talk about that. Well, we discovered the figures version earlier after death, so that is inherently valid. That's not the way that testamentary instruments are under Illinois law. A later dated document or a document that's validly amended can be discovered after the date of a testament or instrument is discovered after death, and that's also valid. The reply brief, Your Honor. If he went to the bank to open the trust and he just went and got it notarized, who knew the dollar amount of the trust at that point? No one would have had an obligation, a legal obligation to know. That notary is there to authenticate that it was spiros flacos, the human, when signing. And I will say, Your Honor, that from my experience, financial advisors try not to give legal advice because then they might have the practice, the unauthorized practice of law. So not only would we not expect someone to review that trust, they probably have obligations under their insurance not to review a trust and give advice. The mischief is caused when the attorney who prepares the document sends it out incomplete, and then after that we just don't have the reliability. During the argument of IKY, and also in the trial order, the judge held that the three pages were delivered of the blanks version. That would be the signature page and the first two pages to UBS in August 2005.  You brought that up because that leads me to this question. In the trial court's memorandum that it issued here, it ruled that the first two pages of the trust agreement were consistent with the blank version but not with the two, either the alternative or the figures version. How so? They were blank. The gift amounts in Section 3.1 and 3.2 were left blank. But how does the judge reach that? The judge can write and say that the blank version is more consistent than the other two. Right. So the judge is making a reasonable inference, based on the undisputed facts, that the attorney who drafted the document delivered it to the client, that the client took it for signature, and then delivered still blank version one month later when the financial advisor requested a copy of the trust. So it is allowed for the trial court to look at undisputed facts and make reasonable inferences from what the clients were trying to achieve. Mr. Vlachos was trying to achieve the opening of a brokerage account with his trust. And there has been no evidence put on whatsoever that Mr. Vlachos would want to undermine, sabotage, somehow give the financial advisor a document that is different, that is purposefully different from what he signed a month prior. I.K.Y. And isn't that, isn't there a reasonable inference that he did, he was still toying with giving this money because the other two documents, the versions, the figures, and the alternate figures, show that years later he was still toying with this gift. That's right. So, I mean, how do we not make a reasonable inference, or how could the Court not have made a reasonable inference that, in fact, this was not his intent all along? So he was continuing to look at that version, different versions. So I think I can state with general experience that most testamentary instruments that a client pays for are complete versions once presented to the client. That's what is under the duty of care. Yes, but the lawyer kept saying to him, you know, if you want to change this, put it in there, whatever. So the lawyer didn't really give him a complete, quote, unquote, final document. He never did. It appears from the record from the attorney's notes that Mr. Vlachos had a real difficult time, I wasn't in his head, but a real difficult time determining what gift to give to IKY, such that the attorney even said, you know what, I'm giving you an incomplete version, because apparently you haven't come to a decision. And we still don't know, even as we're sitting here, when, if ever, he came to a final expressed decision, because we have multiple versions. So then if that is your position, how is summary judgment granted in your favor? Sure. Because we have the sum total of all the evidence that is going to become available. The settler is deceased. There are no witnesses. Having a trial so that all of the evidence that we already have be submitted to the trial court is unnecessary and inefficient. Mr. IKY's attorney, Mr. Hynskill, said multiple times, this is all we have. This is all we have. They're not asking for you to remand it. They're not asking for you to remand and have witnesses come in and testify about credibility. They're asking you to overturn and to enter judgment in favor of the figures version, which has no chain of custody. So that is implication that, unfortunately, this is all the evidence we have. But the part of the ---- But if that's all the evidence you have, isn't ---- couldn't an argument be made that there is a issue of fact for the charter of fact? The ---- there are no undisputed facts. All the facts are accepted. They are meager facts. We wish we had more facts. This is a circumstance where the settler is a beneficiary, is also ---- is deceased and apparently did not provide, except for one time, any version of the trust to any person during his lifetime. Everyone wishes for more truth than what we have, but that is what we have. And so, Your Honor, the facts, unfortunately, are the sum total of them. The IKY's brief, the reply brief, has a chart in which they try to lay out the facts. You'll notice that there's no column, this is page 3, of alternative figures version. So this is IKY trying to exclude the idea of an alternative figures version. You also see it in the chart at the bottom. It says, where was this document discovered? The blanks version at UBS's offices produced pursuant to a subpoena. And the figures version provided to the trustee from whom was presumed to be Spiro's attorney in Greece. That is not a fact in evidence. There's no ---- But that attorney is not in evidence. Was that from an attorney in Greece that provided the figures version? We don't know. That's what I'm afraid to say, Your Honor. There are no one who testified. There was no affidavits who described that there was an attorney in Greece who discovered the figures version, who delivered it. This is IKY's trying to bolster the chain of custody when it doesn't exist. There's no citation in any of their briefs to that testimony. If there were additional facts, this case might be different, and then maybe the trial court would have some kind of reasonable inferences. But the reasonable inferences on the facts that are admitted to the record are completely reasonable under the meager evidence that we have. Can we use parole evidence here? No. Why or why not? Well, there's been no plea for a reformation. It's only a petition for construction. There's been no discussion in any of the causes of action of reformation or rescission. And then in addition, Your Honor, there's no ambiguity here. It feels ambiguous because something's blank. But an ambiguity is an expression of an idea that might be contrary to some other idea that was either in the person's head or that if you put into application leads to results that are different than what the settler might have expected. There's no ambiguity in the blanks version. One last thing, Your Honor. There was discussion, and in the trial court also, that the three pages were the only pages delivered to UBS to open the trust account. That's not accurate. It's more accurate to say that there were three pages retained by UBS. There's been no evidence in the record about what documents were delivered in August 2005. There's no clear evidence that August 2005, the blank version was delivered at that time. Yes, yes. Douglas Eaton at UBS said that we opened the trust account in 2005, and as a requirement we demand that there be, he said, at least the first page and the last page of the trust to show signature and naming. Right, right, right. But the entire document at that time was not delivered to UBS. Unknown. They have three pages, and Douglas Eaton testified that he received them in August 2005. He could have also received the entire version, and then they discarded the middle pages because they don't have the name or the signature and they're not in the business of retaining documents for UBS as business. Thank you, Your Honor. Thank you. No, it's clear as mud. Thank you. Counsel, before you get started, could you first address what was raised by the appellee, the fact that you have avoided in your brief to raise the alternative figures version and why that might be, and why you don't find that to be relevant for your discussions here? First, we haven't avoided it. We raise it within the context of the trial court's obligation and this court's obligation to construe all of the instruments together. The alternative versions version, excuse me, the alternative figures version is one of those instruments. But you ask us in your prayer for relief to ignore that and ignore the blank and that the more valid amendment is the figures version. Well, so here's why. Because we know that the alternative figures version postdates 2013. Why? Because there are markings on the left-hand side of Section 3.1 that refers to 3.1 being amended in May of 2007, and there are markings in Section 3.3 that refer So the only conclusion to draw is that that alternative figures version postdated that May 2013 Second Amendment. It does not speak to what Mr. Spiros-Blachos signed in July of 2005 because we know it came, I'm not good at math, which is why I'm a lawyer, not a doctor, it came well after 2005. Both of them did. Both, I'm sorry, Your Honor? The figures and the alternate figures. No, the figures version, what we have is the same execution and notarization page that shows that it was executed and notarized on July 11, 2005. What we have here is that they are. But they're the exact same pages that were with the blanks version. Well, it depends on how you characterize the blanks version. Are you only talking about the first two and the last page, or are you talking about the entire trust agreement? But what are you talking about when you say it's the same, the first two and the last page? Well, I'm talking about the last page. I'm not talking about the first two pages because there's a fundamental difference. And this is why in my opening recitation I said perhaps we recast the focus from competing versions to the figures version, because what we know is the figures version is a stand-alone version. Version, I use that term lightly. It's a stand-alone trust agreement that contains an execution and notarization page showing that Mr. Blachos signed it on July 11, 2005. The focus on the figures version is these markings in Section 3.1 and 3.2 indicating how much money the entities were to receive for the gift. And we know under Martin v. Martin those are interlineations, and those are presumed to have existed prior to the execution in July 11, 2005. But don't we know they were not filled out on July 11, 2005? You have no idea. We don't know. That's the point, because there's nothing in the factual record that says Mr. Blachos filled in the blanks version and did not fill in the figures version. We don't know that Mr. Blachos filled in the figures version and did not fill in the blanks version on July 11, 2005. The only thing that we have from that time period are the first two and last page, which is the UBS version that has the same execution and notarization page, and the figures version that has the same execution and notarization page. Mr. Schmidt was asked a question about the trial court comparing those versions, and Mr. Schmidt said something that was very noteworthy and says that the judge is entitled to and made a reasonable inference. But this is the point. The inference was drawn not on facts, but on the trial court's hunch, what it believed could have happened. That doesn't overcome the presumption that those sections in 3.1 and 3.2 were filled in on July 11, 2005. That's what we have to go by now. Counsel, so that I'm clear on your position here, your position is that the figures version is an amendment to the document that's signed that's blank, that was sent to UBS, that it is an amendment, and it had all of the proper requirements to amend a trust? That's your position? Our position is that if Your Honors are not to accept that the figures version contained those interlineations as of July 11, 2005, at the very least under Section 2.1 of the trust agreement, it constitutes a valid amendment. Because it's signed? It is signed. Is it notarized and is it dated? Yes, yes. When is it signed, notarized and dated? July 11, 2005. But you see, that begs the question as to how do we get there? I mean, there is, as you've laid out and made clear and the pleadings are clear, there is no other evidence that is coming before any court regarding this case. And that's why it's so important. We have to be careful. What we have to go by is the execution and the notarization page. And it shows that it was signed on July 11, 2005. There is no evidence to suggest, and Your Honors, I see, I hear that my time is up. Can I? Yes, you may continue. So there's no evidence to show that it was not signed on July 11, 2005. But more importantly, that those portions of Section 3.1 and 3.2 were not filled in. That's the presumption we draw. You say that the court, it was just mere inference and guesswork. Correct. So that's your position when they entered summary judgment on behalf of the family. Why would that not be mere speculation and guesswork if they entered summary judgment on behalf of your client? Because the figures version with the execution and the notarization page constitutes a stand-alone document. That is the focus. We're not talking about competing documents. The focus is on the figures version. Because it came later. No. It came at the same time. So it was discovered later. Correct. Because the date of discovery doesn't matter. It doesn't change. It doesn't speak to what was signed, and it doesn't speak to when, more importantly, it doesn't speak to when provisions 3.1 and 3.2 were actually filled in, handwritten. That's why none of the other stuff, what I'll consider white noise, doesn't matter. The focus is there is no evidence on which the trial court can properly conclude that the gift in 3.2 should be voided because those markings in 3.2 did not exist before the time Mr. Blachos had that version executed on July 11, 2005. And we don't know that. We don't know. And because we don't know, there is no overcoming the presumption in Martin v. Blachos that we are simply guessing. And, again, this Court's work is to affirm the intent of the testator. And objectively speaking, no one can say that Spiros Blachos intended IQI to get nothing and the family members to take 99 percent of the trust after the payment of the gift in 3.1 because the gift was present in the Glantz version, figures version, the ultimate figures version, was never amended in the First Amendment, and was never amended in the Second Amendment, despite him having the opportunity to do so. And, Your Honors, I appreciate your time. If you have no other questions, I can conclude. And for those reasons, we'd ask that this Court respectfully reverse the trial court's ruling. Thank you, Counsel. Thank you, Your Honors. I have no further questions of either Justice. Is there any further questions? None. Thank you. The Court at this time would like to thank both parties for your arguments this morning. This case will be taken under advisement, and a disposition will be rendered in due course. Mr. Clerk, you may terminate disposition. We will close this case.